**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| Oliver Wyman, Inc., | : | |
| Plaintiff, | : | Case No. 22-cv-10353 |
| -- v. -- | : | **FIRST AMENDED COMPLAINT** |
| Waltzing Matilda Aviation, LLC, | : | |
| Defendant. | : | |

Plaintiff Oliver Wyman, Inc. ("Oliver Wyman" or "Plaintiff"), by and through its attorneys, as and for its Amended Complaint against Defendant Waltzing Matilda Aviation, LLC ("WMA" or "Defendant"), alleges as follows:

## INTRODUCTION

1. This action arises from WMA's multiple breaches of the agreement that it entered into with Oliver Wyman whereby Oliver Wyman was to provide aviation consultancy services to WMA.

2. The parties entered into an engagement letter dated November 16, 2020, whereby Oliver Wyman agreed to provide various services, and WMA agreed to pay Oliver Wyman's invoices for such services within thirty days of receipt (the "Agreement"). Following execution of the Agreement, the parties entered into six separate change orders that expanded the scope of Oliver Wyman's work on behalf of WMA.

3. Unbeknownst to Oliver Wyman at the time of the negotiation of the Agreement, WMA had apparently set it its sights on soliciting the lead Oliver Wyman partner on the WMA account, such that several months after the Agreement's execution, it was announced that this partner would leave Oliver Wyman and join WMA – a blatant violation of the employee non-solicitation provision in the Agreement.

4. Notwithstanding this breach, which led to significant damages resulting from the loss of a key team member, Oliver Wyman fully performed the specified work pursuant to the Agreement and the various change orders. However, after invoicing WMA for the services it had provided, Oliver Wyman received no payments from WMA.

5. After several attempts by Oliver Wyman to remind WMA of its payment obligations pursuant to the Agreement and change orders, including a legal demand letter, Oliver Wyman has received only a small fraction of the outstanding amounts to which it is entitled under the Agreement.

6. Oliver Wyman, accordingly, brings this action to recover compensation for the services that WMA requested and agreed to pay for and that Oliver Wyman provided. Oliver Wyman also seeks compensation for the wrongful solicitation and employment of a key Oliver Wyman employee, in direct violation of the Agreement, as well as reasonable attorneys' fees and costs, and all other appropriate remedies.

## PARTIES

7. Plaintiff Oliver Wyman is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 1166 Avenue of the Americas, New York, New York 10036.

8. Defendant WMA is a limited liability company. WMA has two members, each of whom are natural persons, and each of whom are citizens of the State of Texas.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship among the parties.

10. Plaintiff Oliver Wyman is a corporation organized and existing under the laws of Delaware with a principal place of business in New York.

11. Defendant WMA is a limited liability company with two members.

12. The two LLC members of WMA are natural persons who are both citizens of and domiciled in the State of Texas.

13. The amount in controversy exceeds $75,000.

14. The Court has personal jurisdiction over Defendant. Defendant regularly conducts business in and has regular systemic contacts with New York, including contacts related to the Agreement.

15. Venue is proper in this Court under 28 U.S.C. § 1391(b). A substantial part of the events or omissions giving rise to the claims occurred in New York, New York.

16. In addition, the parties expressly agreed in the applicable Agreement to submit to the exclusive jurisdiction of the Courts located in the State of New York.

## FACTUAL BACKGROUND

***The Parties Negotiate an Agreement for Oliver Wyman to Provide Services to WMA.***

17. Oliver Wyman, through its division Oliver Wyman Cavok, provides technical consulting and services to the aviation, aerospace and rail industries.

18. WMA provides private, chartered air travel and aircraft management services out of the Boston area.

19. WMA has a Part 135 license with the Federal Aviation Administration ("FAA"), which allows it to operate charter services with its Citation Excel and Challenger-N617BW aircraft.

20. In or around mid-2018, WMA was looking to expand its services by obtaining a Part 121 FAA license, which would allow it to provide scheduled and unscheduled air services on larger aircraft in the United States and Canada.

21. In order for an air carrier to receive a Part 121 license, it needs to go through an extensive Air Carrier Certification process, as detailed in 14 CFR Part 121. This process includes the creation of an air carrier Company Manual System ("CMS"), an extensive document that details every aspect of the air carrier's operations. Once the initial CMS is submitted to the FAA, an iterative process takes place between the air carrier and the FAA, with the FAA responding to the initial CMS with "comments," oftentimes hundreds of them, and engaging in a series of meetings and discussions with the air carrier, as modified versions of the CMS are provided and appropriate training is conducted.

22. Oliver Wyman Cavok is an FAA accredited Qualified Certification Consultant, which certification allows Oliver Wyman to work with companies seeking FAA Part 121 licensure in order to guide them through the certification process.

23. Accordingly, in mid-2018, WMA requested that Oliver Wyman provide a statement of work whereby Oliver Wyman would assist WMA in the steps necessary to obtain a Part 121 license. The initial bid that Oliver Wyman provided for this work was $1.55 million.

24. WMA did not accept this proposal, but approximately two years later, in late 2020, it returned to Oliver Wyman to resume negotiations for a statement of work regarding its Part 121 licensure.

25. The principal negotiator for the statement of work from WMA was CEO John Thomas, while the principal negotiator for Oliver Wyman was partner David Marcontell.

26. On November 7, 2020, Marcontell indicated to others at Oliver Wyman that a statement of work was about to be signed with WMA with a total contract price of $900,000.

27. This was a significantly below-market rate for Oliver Wyman work of this nature, however, Marcontell indicated that he would be the project manager, and thereby assume the majority of the workload, on the WMA project.

28. On November 18, 2020, the Agreement was executed. However, instead of a total contract price of $900,000, it included a total contract price of $800,000, an even steeper discount than what had previously been communicated. A copy of the Agreement is attached hereto at **Exhibit 1**.

***The Agreement Requires WMA Cooperate, Make Timely Payments and Not Solicit.***

29. The Agreement divided Oliver Wyman's work on behalf of WMA into four phases, with Phase I described as Project Launch/System Design where the planning for the project would take place. Phase II concerned Manual Development, in which Oliver Wyman would assist in putting together the CMS submission. Phase III involved the preparation of the formal submission to the FAA, while Phase IV included certain tasks that would need to be completed after the CMS was approved by the FAA. (Ex. 1, at Section 2.)

30. The Agreement provided that Marcontell of Oliver Wyman would be the "Executive Sponsor who will oversee the overall progress of the project." It further provided

that on the WMA side, the Project Manager would be Rich Seifel, Director of Operations, with support from "proposed Chief Inspector, Joe Spielmann." (*Id.* at Section 3.)

31. The Agreement also provided a number of obligations and undertakings on the part of WMA, including an acknowledgment that "successful completion of this project requires important significant input from WMA and coordination with [Oliver Wyman]." Among the other key acknowledgements and undertakings in the Agreement are the following:

- "WMA acknowledges that proper development of the CMS relies on certain information only available from sources available to WMA… Procurement of these materials… and timely delivery to [Oliver Wyman] are critical to the timing and completion of this project."
- "WMA further acknowledges that it must deliver to [Oliver Wyman], in a timely manner, WMA developed, and manufacturer provided manuals in paper and electronic format…"
- "It is WMA's responsibility to accomplish an in-depth review of all materials developed by [Oliver Wyman] on behalf of WMA, to provided necessary input on essential technology systems, aircraft configuration, and unique operating policies and procedures in a timely manner throughout the development process, and to accept all such materials prior to their use…"
- "All final decisions related to the CMS, its content, structure, composition and use, reside solely with WMA."
- "It is WMA's responsibility to maintain appropriate FAA liaison with respect to the CMS, and to seek and obtain any necessary approval(s) from the FAA for the use of the CMS, as applicable." (*Id.*)

32. With regard to timing, the Agreement provided that the project was to kick off shortly after the execution date, and laid out a timeline to completion of approximately nine months. However, the Agreement noted "[c]ompletion of the certification effort and issuance of the [Part 121 license] within the nine months desired by WMA is dependent upon WMA meeting the obligations outlined in the Client Obligations – Responsibilities section…" (*Id.* at Section 4.)

33. With regard to the timing of the $800,000 fixed fee, the Agreement lays out a series of milestones by which portions of the payment are to be made. (*Id.* at Section 5.) It further provides that invoices "will be due and payable within 30 days of the issue date," and that "overdue or late invoices will result in immediate suspension of all activities which may cause further delays in obtaining FAA Part 121 Air Carrier certification." (*Id.*)

34. The Agreement further provides that "[i]n the event that the project is cancelled, [Oliver Wyman] will prorate the fees based on work already completed." (*Id.*)

35. With regard to termination, the Agreement provides it "can be terminated by either party with or without cause with thirty (30) days' prior written notice to the other party. WMA will be obligated to pay [Oliver Wyman] professional fees for work completed in accordance with the mutually agreed requirements, on a pro rata basis for work completed, based on the effective date of termination." (*Id.*)

36. Included in the Agreement are Terms and Conditions of Business. Section 14 is entitled "Non-Solicitation," and provides in relevant part:

> During the term of [the Agreement] and for one year following the last date on which the Company provides Services thereunder, neither party will solicit for employment, employ or otherwise engage in the service of any consultant or other professional or managerial level employee who is employed by the other party and was involved with the Services described in such [Agreement.]"

(*Id.* at T&C § 14.)

37. Section 16 of the Terms and Conditions provides that "[e]ach party submits to the exclusive jurisdiction of the courts located in the State of New York," and that New York law applies to "all matters arising out of or related to the Agreement, including, without limitation, its enforcement."

***Oliver Wyman and WMA Enter Into a Series of Change Orders Expanding Upon Oliver Wyman's Work.***

38. Following the execution of the Agreement, Oliver Wyman and WMA entered into six separate change order that expanded upon the services that Oliver Wyman was to provide to WMA (the "Change Orders").

39. Change Order 1 was entered into on February 13, 2021, and provides Oliver Wyman is to assist WMA with the implementation of their Maintenance & Engineering and Flight Operations & Crew Management software solutions, in exchange for WMA paying Oliver Wyman a flat fee of $50,000.

40. Change Order 2 was entered into on March 2, 2021, and provides Oliver Wyman is to assist WMA with an aircraft records review and technical representative support. The fees associated with aircraft records review work were $850 per records specialist per day not to exceed $40,000 per aircraft, and the fees associated with technical representative support were $850 per technical representative per day.

41. Change Order 3 was entered into on April 5, 2021, and provides that WMA might request additional support not covered under the original Agreement, in which case, Oliver Wyman will bill for such work at a time-and-materials basis at the rate of $1700 per day.

42. Change Order 4 was entered into on May 10, 2021, and modifies Change Order 1 by providing that Oliver Wyman will expand its support of WMA's iFlight MRO software system, while for the iFlight Lite system, support will contract. Change Order 4 provides for a

flat fee for these services of $152,067, in addition to the $50,000 flat fee associated with Change Order 1.

43. Change Order 5 was entered into on July 1, 2021, and provides that Oliver Wyman is to train the WMA technical publications staff in the use and content revision of the company manual suite for a fixed fee of $7,200.

44. Change Order 6 was entered into on July 22, 2021, and provides that Oliver Wyman will perform the IPC and historic OCCM/HTC/LLC component gap resolution and the Oliver Wyman MRO IT team will provide initial guidance and answer any questions by Oliver Wyman aircraft acquisition team, WMA, and IBS. The fee for gap resolution is a daily rate of $850, with support for the MRO IT team estimated for 3-5 days at a daily rate of $1,700.

45. The six Change Orders are attached hereto as **Exhibit 2**.

***WMA Fails to Take Steps Necessary for the Part 121 Certification Project to be Successful.***

46. The project as described in the Agreement commenced on or about December 1, 2020.

47. From shortly after the commencement of the project through its termination, WMA did not take the steps necessary in order to allow it to successfully result in the issuance of a Part 121 license with the FAA.

48. For example, a key part of the Part 121 certification process for any air carrier is for it to designate five key employees – two pilots, two mechanics, and a safety expert – who are to be the company representatives with the knowledge and experience necessary for the Part 121 certification, referred to as "Part 119 Management Personnel" and known colloquially in the industry as the "5 Wisemen."

49. Early on in the process, Oliver Wyman expressed concern to WMA that it did not have the requisite personnel to fill the roles of the 5 Wisemen.

50. WMA partly responded to these concerns by hiring outside contractors to fill the roles of some of the 5 Wisemen. However, these individuals were largely unavailable for detailed communications with Oliver Wyman, as many continued to work other jobs simultaneously. In addition, WMA specifically directed Oliver Wyman to limit their contact with the contactors due to cost concerns.

51. Part of Oliver Wyman's role as laid out in the Agreement was to provide training to the 5 Wisemen on the certification process, including the information they must become familiar with prior to meeting with the FAA in order to successfully achieve licensure. Without having sufficient access to the 5 Wisemen, Oliver Wyman was unable to complete this training process and was not provided with information needed for key portions of the CMS manual.

52. Because it was WMA and not Oliver Wyman that would be presenting itself in front of the FAA, it was vital for WMA itself – specifically the 5 Wisemen – to be fully apprised and knowledgeable about all of the information contained in the CMS. Oliver Wyman repeatedly expressed concerns to WMA about the quality of the presentation that the 5 Wisemen were able to make in front of the FAA, given the lack of access, and requested additional time to prepare these individuals in order to ensure that they could speak with authority before the FAA.

53. As another example of WMA not taking steps necessary for the issuance of the Part 121 license, although WMA knew generally the type of plane that it wanted once it received the Part 121 license, it did not have that plane in its possession or know any details or specifics about the functionality of the plane.

54. Without having detailed information about the functionality of the plane, such as the type of IT system that was being used in the plane, Oliver Wyman was unable to include this required information in the CMS manual.

55. While Oliver Wyman's role in the certification process included ensuring that each of the key components of the CMS manual was included when the final submission was made to the FAA, it was the responsibility of WMA to provide Oliver Wyman with detailed, company-specific information that needed to be included in the CMS document.

56. After considerable back-and-forth between Oliver Wyman and WMA, the initial draft of the CMS was submitted to the FAA on April 2, 2021, consisting of a document over 6,000 pages in length.

57. On May 13, 2021, the FAA responded to the initial CMS submission with 41 comments, which is an unusually small number of comments after an initial CMS submission for a Part 121 license.

58. The FAA had also by this time begun engaging WMA in a series of discussions regarding the CMS, training and other matters. As is typical practice, Oliver Wyman was not permitted to participate in these discussions.

59. Oliver Wyman assisted WMA in review of and response to the FAA's comments to the initial CMS. This review took place, among other times, during a meeting between Oliver Wyman and WMA in Atlanta in May or June 2021.

60. At around this time, WMA expressed concerns about any delay in the FAA approval process, noting that it had purchased a training package that could not be postponed, and any delay in the training would result in WMA losing money. In Oliver Wyman's estimation, purchasing a non-refundable training package without having FAA approval of the

CMS, particularly one that unrealistically allowed no time to respond to comments from the FAA, was a significant error, given that multiple iterations of comments from the FAA was common and to be expected.

61. Oliver Wyman assisted WMA in putting together a modified version of the CMS, which incorporated not only responses to the FAA's May 13 comments, but also included additional changes that had been made by WMA. Oliver Wyman, at WMA's request, also put together information to be included in a letter for WMA to send to the FAA responding to the FAA's May 13, 2021 comments.

62. The modified version of the CMS was submitted to the FAA on June 11, 2021. However, unbeknownst to Oliver Wyman at the time, WMA failed to include the letter reponse to the FAA's May 13, 2021 comments.

63. On or about June, 17, 2021 the 5 Wisemen met with the FAA to discuss the modified CMS. WMA did not provide detailed information to Oliver Wyman as to what transpired at that meeting, though Oliver Wyman later came to learn that the FAA indicated it would have additional comments, and it was not yet ready to approve the CMS.

64. Oliver Wyman also later came to learn that the FAA had stated it would not permit WMA to conduct training prior to the CMS approval. Upon information and belief, this was viewed by WMA as a major and costly setback, and one for which WMA (unjustifiably) blamed Oliver Wyman.

65. On July 1, 2021, the FAA sent their formal response to the modified CMS, providing a total of 24 additional comments. These comments, while routine and to be expected, were framed by WMA – in particular the WMA project manager who had scheduled and lost money on the training package – as the responsibility and fault of Oliver Wyman.

66. Sensing a degradation in the parties' working relationship, the Oliver Wyman project manager scheduled a call with WMA's CEO, which took place July 13, 2021. During that call, Oliver Wyman suggested that the parties agree to terminate the Agreement. This was confirmed in an email from Oliver Wyman dated July 19, 2021, which provided that the Agreement would terminate as of August 20, 2021.

67. Pursuant to the provision in the Agreement permitting Oliver Wyman to prorate the $800,000 flat fee in the event the Agreement terminated early, Oliver Wyman determined that it would only invoice WMA for $400,000 of the $800,000 fee amount.

***Oliver Wyman Provides Additional Services to WMA Pursuant to the Change Orders.***

68. From February 2021 to July 2021, Oliver Wyman also provided a host additional services to WMA beyond what was documented in the Agreement, pursuant to the various Change Orders that the parties had entered into.

69. Oliver Wyman assisted WMA with the implementation of their Maintenance & Engineering and Flight Operations & Crew Management software solutions, as set forth in Change Order 1.

70. Oliver Wyman assisted WMA with an aircraft records review and technical representative support, as set forth in Change Order 2.

71. Oliver Wyman will expanded its support of WMA's iFlight MRO software system, as set forth in Change Order 4.

72. Oliver Wyman trained the WMA technical publications staff in the use and content revision of the company manual suite, as set forth in Change Order 5.

73. Oliver Wyman performed the IPC and historic OCCM/HTC/LLC component gap resolution and the Oliver Wyman MRO IT team provided initial guidance and answered any

questions by Oliver Wyman aircraft acquisition team, WMA, and IBS, as set forth in Change Order 6.

***WMA Inappropriately Solicits and Hires Oliver Wyman's Employee.***

74. Coloring the parties' working relationship from December 2020 to August 2021 was WMA's improper solicitation and eventual retention of the individual who had been intended to serve as the lead Oliver Wyman partner on the WMA project, David Marcontell.

75. Marcontell signed the Agreement on behalf of Oliver Wyman on November 16, 2020, and began working on the project on or about December 1, 2020 as the Oliver Wyman project manager.

76. However, on March 22, 2021 – in the midst of the WMA project – it was announced that Martontell was leaving Oliver Wyman to begin work as the Chief Operating Officer of WMA.

77. From that point on, Marcontell continued to be actively involved in the WMA project – but as the project manager on the *WMA* side, rather than the Oliver Wyman side.

78. The deleterious effect that this departure had on Oliver Wyman cannot be overstated. Not only did WMA's wrongful solicitation lead to the loss by Oliver Wyman of a valuable partner and revenues associated therewith, but it presented an immediate problem for the WMA project itself, as the individual who had negotiated the below-market rate for Oliver Wyman's services – and promised to be the one performing that work – was no longer available for the undertaking that he had negotiated, to the complete benefit of WMA and harm of Oliver Wyman.

***WMA Refuses to Pay Oliver Wyman for Work Completed.***

79. Oliver Wyman issued multiple invoices for the work that it performed for WMA in connection with the Agreement and the Change Orders.

80. Invoice 60902 was issued by Oliver Wyman on December 3, 2020 in the amount of $200,000 for work performed pursuant to the original Agreement. This invoice was paid in full by WMA.

81. Invoice 623422 was issued on May 4, 2021 in the amount of $50,000 for work associated with Change Order 1.

82. Invoice 62987 was issued on August 11, 2021 in the amount of $40,000 for work associated with Change Order 2.

83. Invoice 63068 was issued on August 20, 2021 in the total amount of $366,865. This invoice included $200,000 for work performed pursuant to the original Agreement, $152,067 for work performed pursuant to Change Order 4, and $7,200 for work performed pursuant to Change Order 5.

84. Invoice 63613 was issued on October 26, 2021 in the amount of $50,839 for work associated with Change Order 6.

85. To date, WMA has failed to pay any part of Invoices 623422, 62987, 63068, or 63613 (the "Invoices").

86. The charges in the Invoices total $507,703 (the "Outstanding Amount"), which includes $200,000 of the $400,000 prorated fee pursuant to the original Agreement, as well as all of the work that Oliver Wyman performed pursuant to Change Orders 1, 2, 4, 5 and 6.

87. Oliver Wyman attempted in good faith to reach a settlement of this dispute through negotiation by its appointed representatives.

88. On March 18, 2022, Oliver Wyman sent a letter to WMA demanding payment of the Outstanding Amount.

89. Nonetheless, WMA has not paid any part of the Outstanding Amount.

**COUNT I – BREACH OF CONTRACT**
**Non-Payment of Invoices**

90. Oliver Wyman repeats and realleges all of the allegations in all of the paragraphs above as though fully set forth herein.

91. Oliver Wyman and WMA have a valid contract (the Agreement and Change Orders) for providing various services to WMA.

92. By its terms, the Agreement and Change Orders are governed by the laws of the State of New York.

93. Pursuant to the Agreement and Change Orders, Oliver Wyman provided all services specified, up to the time of termination.

94. Pursuant to the Agreement and Change Orders, WMA was required to pay invoices within thirty days of receipt.

95. Pursuant to the Agreement, Oliver Wyman issued Invoices for a total of $507,703.

96. WMA has not paid any portion of the Outstanding Amount that it owes to Oliver Wyman, in breach of the Agreement and Change Orders.

97. WMA's failure to pay Oliver Wyman constitutes a breach of the Agreement and Change Orders, resulting in damage to Oliver Wyman in the amount of $507,703.

**COUNT II – BREACH OF CONTRACT**
**Employee Non-Solicitation**

98. Oliver Wyman repeats and realleges all of the allegations in all of the paragraphs above as though fully set forth herein.

99. Oliver Wyman and WMA have a valid contract (the Agreement) for providing Part 121 certification consulting services to WMA.

100. By its terms, the Agreement bars either party during the term of the Agreement and for one year following the last date on which Oliver Wyman provides services thereunder from soliciting for employment, employing or otherwise engaging in the service of any professional or managerial level employee who is employed by the other party and was involved with the services described in the Agreement.

101. During the term of the Agreement, WMA solicited for employment and employed David Marcontell, a former Oliver Wyman employee who was involved in the services described in the Agreement.

102. WMA's solicitation and employment of Marcontell is a breach of the Agreement's employee non-solicitation provision.

103. As a result of WMA's breach of the employee non-solicitation provision, Oliver Wyman has been damaged in an amount to be proven at trial.

**COUNT III – PROMISSORY ESTOPPEL**
**(In the Alternative to Breach of Contract Count I)**

104. Oliver Wyman repeats and realleges all of the allegations in all of the paragraphs above as though fully set forth herein.

105. WMA made clear, unambiguous, specific and definite promises to pay for Oliver Wyman to perform certain aviation consultancy services.

106. Oliver Wyman foreseeably and reasonably relied to its detriment on WMA's promises, by committing personnel, time and resources to performing the services requested by WMA when such personnel, time and resources could have been devoted to other clients' projects and requests.

107. As a direct and proximate result of Oliver Wyman's reliance on WMA's assurances, Oliver Wyman suffered damages in terms of (1) having committed and paid for personnel and resources in order to perform the services requested by WMA rather than perform services for other clients, (2) costs and expenses in having to prepare and send letters to WMA in an attempt to persuade it to fulfill its promises and thereby avoid legal proceedings, and (3) costs and expenses in the filing of this action and otherwise, in an amount as yet to be ascertained, all to be determined before or at the time of trial.

108. Conversely, to date WMA has not paid for any of the services that it requested and has not suffered damages.

109. Enforcement of WMA's promises is necessary to avoid an injustice.

**COUNT IV – UNJUST ENRICHMENT**
**(In the Alternative to Breach of Contract Count I)**

110. Oliver Wyman repeats and realleges all of the allegations in all of the paragraphs above as though fully set forth herein.

111. WMA requested that Oliver Wyman perform certain services and agreed to pay for such services.

112. Oliver Wyman performed services as requested and agreed to by WMA.

113. WMA has received the benefit of such services performed by Oliver Wyman.

114. WMA has failed to pay any amount it owes to Oliver Wyman as a result of Oliver Wyman's performance of such services.

115. WMA has been unjustly enriched at the expense of Oliver Wyman by its receipt of such services without having paid for them.

116. The circumstances are such that equity and good conscience require WMA to make full restitution to Oliver Wyman.

## PRAYER FOR RELIEF

WHEREFORE, Oliver Wyman requests that the Court:

117. Adjudge and decree that WMA is liable for breach of contract, promissory estoppel and/or unjust enrichment as alleged herein;

118. Enter judgment against WMA that awards Oliver Wyman an amount of damages equal to the Outstanding Amount;

119. Enter judgment against WMA for breach of the employee non-solicitation provision in the Agreement in an amount to be proven at trial;

120. Award prejudgment and post-judgment interest at the statutory rate, costs and reasonable attorney's fees; and

121. Grant such further relief as the Court deems just and proper.

Dated: New York, New York
December 19, 2022

AGUILAR BENTLEY

By: __*s/ Lisa Bentley*__________

Lisa Bentley
5 Penn Plaza, 19th Floor
New York, New York 10001
Phone: (646) 648-0469
(917) 216-7236
lbentley@aguilarbentley.com

*Attorneys for Plaintiff Oliver Wyman*